

# Fourth Court of Appeals

## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-15-00640-CR

Eduardo **REYES**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 226th Judicial District Court, Bexar County, Texas
Trial Court No. 2014CR0808
Honorable Sid L. Harle, Judge Presiding

Opinion by:   Luz Elena D. Chapa, Justice

Sitting:   Sandee Bryan Marion, Chief Justice
Marialyn Barnard, Justice
Luz Elena D. Chapa, Justice

Delivered and Filed:  June 15, 2016

AFFIRMED

Eduardo Reyes pled guilty to charges of murder and aggravated assault with a deadly weapon. Reyes raised and issue of sudden passion in mitigation of punishment, which was tried to the court. The trial court rejected Reyes's claim of sudden passion and sentenced Reyes to thirty five years' confinement on each count, to run concurrently. Reyes appeals, arguing there is factually insufficient evidence to support the trial court's rejection of his claim of sudden passion. We affirm.

## DISCUSSION

At the punishment stage of a murder trial, "the defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause." TEX. PENAL CODE ANN. § 19.02(d) (West 2011). If the defendant proves the issue in the affirmative by a preponderance of the evidence, the murder offense is reduced from a first degree felony to a second degree felony. *Id.* § 19.02(d).

"'Adequate cause' means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1). "'Sudden passion' means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." *Id.* § 19.02(a)(2). To be entitled to an affirmative finding on the issue of sudden passion, the defendant must demonstrate that there was an adequate cause or provocation; "that a passion or an emotion such as fear, terror, anger, rage, or resentment existed;" "that the homicide occurred while the passion still existed and before there was reasonable opportunity for the passion to cool; and that there was a causal connection between the provocation, the passion, and the homicide." *McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005). Fear or anger alone is insufficient to establish sudden passion unless "the cause of the fear could produce fear that rises to a level of terror which makes a person of ordinary temper incapable of cool reflection." *De Leon v. State*, 373 S.W.3d 644, 650 (Tex. App.—San Antonio 2012, pet. ref'd). "[A] defendant may not rely on a cause of his own making to support a claim of sudden passion." *Id.*

When the defendant raises a factual sufficiency challenge to an adverse finding on a plea he had the burden to prove by a preponderance of the evidence, we apply the civil standard of review and determine whether the finding was against the great weight and preponderance of the

evidence. *Matlock v. State*, 392 S.W.3d 662, 667 n. 14, 671 (Tex. Crim. App. 2013); *See Bernard v. State*, 401 S.W.3d 145, 147 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (holding standard applies to factual sufficiency review of finding on claim of sudden passion). We review all of the evidence in a neutral light, and we may not usurp the factfinder's function of assessing the weight and credibility of the witnesses' testimony by substituting our judgment for the factfinder's. *Matlock*, 392 S.W.3d at 671. We may sustain the challenge only if the evidence contrary to the finding greatly outweighs the evidence supporting it and the finding "is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *Id.*

Reyes testified he had been in a relationship with Megan, the murder victim, for three or four years, and they had a child together. He testified he became aware that Moses, a student at Megan's school, had made sexual advances toward Megan on Facebook. Reyes stated that on the morning of the murder, he woke up early because he was excited that he and Megan were going to "g[e]t back together" and "try to work things out." He expected Megan to stop by his house before school so they could talk, but she did not. Reyes decided to take their baby and ride the bus to meet Megan at school in the afternoon. He testified that he took a knife with him for self-defense because he had previously been in a fight with Moses and Moses had threatened him. Reyes stated he had been told that Moses was "talking shit."

Reyes testified that when he arrived at the school, he saw Megan and a crowd forming near her, and some students were pointing at him and making gang signs. Reyes stated Megan approached him and they started arguing about "dumb stuff." Reyes testified he and Megan continued arguing, and then Megan took the baby and walked away. According to Reyes, a crowd of students came toward him and jeered at him. Reyes stated he followed Megan and tried to get the baby back, but then he heard Megan say "I'm going to go with him." Reyes testified:

I don't remember much. I don't even remember stabbing her. I don't remember none of that. I just -- I just remember as soon as -- as soon as I heard "why Eddie" or something, I just remember hearing my name and I looked down at my hands and I just remember seeing just blood on my hands and black spots from -- I don't know, man. I just remember looking at the knife, backing up to the streets. I kept asking myself "what the fuck did I do?" I remember backing up walking backwards to the streets and a guy hit from behind, so when I turned around, it was somebody out of the crowd.

I just remember we were starting swinging at each other. After that, he backed up and I just noticed the whole crowd came up behind him, too, and I was just circling and I just remember getting hit from all directions, so I just started swinging at everybody.

Crystal, another student, testified she was sitting at a bus stop at school when Megan and Reyes came and sat next to her. Crystal testified they were arguing loudly and Reyes kept asking Megan to give the baby back to him. Crystal stated there was not a crowd of students around where they were sitting, but there were twelve to fifteen male students from the school at another bus stop across the street. Crystal testified Reyes kept grabbing Megan by the arm with which she was holding the baby, and one of Megan's friends came from across the street and took the baby away. Crystal testified Reyes then started punching Megan while Megan was still sitting down "until she dropped to the floor and that's when everyone ran from across the street and then I had seen her bleeding and I noticed that she had got stabbed and then someone else was cut."

Robert, another student at Megan's school, testified he was crossing the street and saw Reyes punching Megan "[a]round the stomach and the chest area." Robert stated he told Reyes to stop and Reyes "turned around and he punched me in the arm." Robert testified he saw blood and first thought it was Megan's but then realized Reyes had stabbed him. Robert denied that anybody else had approached Reyes before Reyes stabbed him, but after he was stabbed, several others approached and tried to take the knife out of Reyes's hand. Robert testified Reyes and Megan had broken up and Megan was "with Moses." He further testified he was not in a gang and was not aware of any students at the school who were in a gang.

Reyes's mother, Ana Maria Garcia, testified she had a conversation with Reyes the morning of the murder. She said she advised Reyes not to go to the school and not to take the baby. Garcia testified she told Reyes not to go "[b]ecause I saw how mad -- he was angry, he was mad, he was crying. He was saying that he was going to go and give the baby to Megan and then she was going to leave so he was going to be without the baby."

Dr. Jack Ferrell, a clinical forensic psychiatrist who interviewed Reyes, testified Reyes was sane and competent, but "had some difficulty putting complex emotions, complex situations into proper categories. It was sort of black or white about a lot of things." He stated Reyes told him that Reyes and Megan would often argue, slap each other, tear each other's clothes, separate, and then get back together.

Reyes argues he "was in a fit of rage induced by the combination of the threat he felt with Moses taking over his relationship, Megan walking away, and the threat he felt when Megan took the baby." However, Reyes acknowledged he took the baby into a dangerous situation for which he armed himself with a knife for self-defense and, according to Garcia, Reyes knew Megan was going to leave him and take the baby. Reyes may not rely on a cause of his own making to support a claim of sudden passion. *See De Leon*, 373 S.W.3d at 650. Garcia's testimony that Reyes was "angry, mad, and crying" before Reyes took the bus to Megan's school showed the passion existed before Reyes went to the school and there was reasonable opportunity for Reyes's passion to cool. Furthermore, Crystal and Robert contradicted Reyes's testimony that a group of menacing students was forming around him and Megan before the stabbing. Having reviewed all the evidence in a neutral light, we cannot say that the trial court's rejection of Reyes's claim of sudden passion arising from adequate cause "is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *See Matlock*, 392 S.W.3d at 671.

## CONCLUSION

We affirm the trial court's judgments.

Luz Elena D. Chapa, Justice

DO NOT PUBLISH